All it needed was two or three sentences, which is, you know, in addition to whatever else it said, we understand that Wainwright is, not Wainwright, that Mankind is going to be announcing, you know, is going to be coming out in a couple of days with an offering of up to 10.1 million shares at $6 per share. That's it. Two sentences. To put that together, it certainly could have been done easily in the two and a half hours from the time that the report went out before trading started that day, and if not then shortly afterwards. It certainly didn't have to take 17 hours, especially for Wainwright. Could I interject for a moment, please? I'll give you some extra time to make up for this, but I've been handed a note indicating that the IT department was having trouble hearing what was said. Has that now been corrected? Yes, they've now corrected. I wanted to make sure. Have all the judges been able to hear everything? I have. So have I. Okay. I guess we're all okay. So Mr. Press, go ahead and proceed. And could Blanca add an extra minute on the clock for Mr. Press? Yes, Judge. By the way, Blanca, I don't see the clock isn't showing on my screen here. Okay, hold on, Judge. Are we back now? I don't see the clock either, Your Honor, but I can continue. Let's wait a minute to see if she can restore that. Hold on one second, Judge. Can you see it now, Judge? No, the clock is, the video is turned off, I think, just like when we turn our video off. Okay. Is everyone in gallery view? Yes, it says courtroom clock, Blanca, on one of the things, but it isn't showing anything. It's blacked out. Yeah. I'm letting the A.B. team know. Just one moment. Sorry, Mr. Press, to keep you in limbo here for a minute. We're looking at this right now. No, we could proceed with that o'clock if that's the only alternative because, but I think it's easier for the advocates if they know how much time they've got. I now can see the clock. So is that where, Blanca? Yes, Judge, I paused the clock and I added the minute when we were having issues. So that's the correct time left. Okay, so why don't we proceed? Okay. Your Honor, so I believe that with respect to H.C. Wainwright, the complaint pleads that it was a department whose job it was to check the activities of investment banking and then, before approving the reports, you had the motive. You also had that disclosure that they will seek investment banking business from mankind in the next three months, and this was the only investment banking business they sought. In addition, Your Honor, I believe that the complaint pleads to see enter separately of the chief operating officer of Wainwright, Edward Silvera. He certainly was involved in the offering. He's the person who signed the placement agreement for the offering, which a copy of which is at his signature is at page 91 of the record excerpts, and he was the direct report for the compliance department personnel. So this is one other person besides the compliance department personnel who would have been in a position to know of both the offering and the report. So either one of those, I believe, see enter is pled, Your Honor, and I see now that I'm down to four minutes. So unless the court is any further, I have one quick question for you, and I'll add another bit of time for you. But my understanding is that you need to show a strong inference of see enter. So if it's could be see enter, could be negligence, then the complaint probably needs to be dismissed. So why do you think you satisfy the requirement of a strong inference? Yes, Judge Gould, I think that what takes it out of the realm of negligence, we have obviously the procedure for compliance, but what takes it out of the realm of negligence were two factors, one being the motive. They had this motive to inflate the stock price of mankind for that day and maybe the day before only. And the second thing was they put this language in the report, we will seek investment banking business within the next three months. What that sounds like to me, Your Honor, is they put in language that they can maybe point to later. And in fact, at the district court level, they did to say, oh, we disclosed the offering without actually disclosing that there was going to be a below market dilutive offering the next day. This, you know, we will seek investment banking within the next three months. I think both of those, the motive and the language of that of that disclosure suggest that this was not just an innocent error, Judge Gould. Okay, thank you, counsel. So at this point, we'll pause on Flynn's argument, the balance argument, but increase Mr. Press's time to four minutes for rebuttal. So four minutes. Thank you. So now we can proceed with Mr. Auslander. Thank you, Your Honor. I may please the court, Jay Auslander, Wilk Auslander for the appellee. I want to actually just begin for a moment, Judge Gould, with where you left off, and then I'll deal with the pleadings as a whole. And that is, how is there here any inference of scienter, of a recklessness bordering on intent that is greater than any other inference? And of course, the district court found that there was none. And I'll start with my colleague's There's two reasons you can know that. Number one motive, they wanted to make money. And number two, there's a disclosure in the report that says that they're going to seek banking business with these companies that are mentioned in the report. I think we can dispose of those very quickly because they do not comport with any of the cases under the PSLRA or Rule 9B. He actually had three, right? The third one was that they have a department, a two-person department that is looking over all these things and let us through, I think was his third. So I'll deal with that one as well, Your Honor, because my colleague also referred to abundant evidence in the pleading, and I'll address that as well. And I can do that now too, but I'll start with motive. Making money is not motive enough to numerous cases in the briefs that say that, and it shouldn't be surprising because every business is motivated to make money. And in response to Judge Lee's question earlier on, H.C. Wainwright's fee structure was that they were going to get 5% of the roughly $60 million that was going to be raised. As long as the $60 million was going to be raised, they're getting 5% of that, regardless of the price of the stock. To get there was 5%. That's their fee. It wasn't based on a stock price. So, okay, they were motivated to make money. Every business is. It'd be hard-pressed to find a business that isn't, and that's what- Counselor, as far as I understand, if the price was lower, were they going to issue more stock, or were they going to only issue so much stock? Because if they're only going to issue so much stock, if the price had to be lower, then they were going to make less money because the overall income from the stock issuance would be lower, and 5% of that is a lower number. Am I missing something? No. I think the engagement, Your Honor, and the raise was in order to hit that $60 million number. Obviously, when you apply the formula to the price, there's going to be a difference depending on what the stock price is, but they're going to get to the $60 million was the goal, and the fee was based on that goal. There's really no dispute about that. The deal is what the deal was, and that's what it was. They had a motive to make money, which is not surprising for an investment bank. Secondarily, there is, in this draft, in the research report, are two disclosures, actually, that were put in by Oren Livnod, who wrote the report. One is the standard FINRA disclosure. It's required, and it says that we in this report. That's why it's in there. It's the FINRA-required disclosure. It indicates nothing other than that Wainwright was following the rules. The other disclosure that's in the report is a disclosure that Mankind made, which Mankind had been telling, essentially, the market that it was going to need money. It was in a cash crunch, and it needed to raise more money to fund its operations. So those are disclosed. Within the realm of no good deed goes unpunished, those were apt disclosures. One shows Wainwright complying with FINRA. The other was what Mankind had disclosed to the market on its own, on other occasions, and was disclosed here. But let's remember something. The complaint against Livnod was dismissed with prejudice. The plaintiffs could not come forward with any evidence whatsoever, and there is no allegation in the pleading that says that Orrin Livnod, and I don't mean a conclusory allegation. There's lots of those. But there's no factual allegation that says that Orrin Livnod had any knowledge whatsoever about an impending deal with Mankind. Nothing. There's no statement of when he knew that, or whether he knew that, or how he could have known that, or who told him. Nothing. So there isn't a single factual allegation that says that when Wainwright issued that report at four in the morning on October 10th, Livnod, the guy that put those disclosures in that my colleague just talked about, had any idea that there was going to be an engagement. So that's number one. There is, so the motive is not enough. Making money is not enough. And in terms of the disclosures, one of them was required, the other was out in the market by Mankind. Let's talk about, Judge Van Dyke, the other allegation, which is that it has this very small compliance department, and therefore somebody would have, could have, should have seen it. That's not enough under any definition of the pleading standards under the PSLRA or 9b, and we'd be eviscerating the cases that require someone to plead the who, what, where, and when. There isn't a single allegation in this complaint that identifies any member of the compliance department that either knew about the offering when the report came out, knew about the report when there was a discussion of an offering, or knew about both. No allegation whatsoever. What they've done to try to support this pleading is they've attached a declaration by somebody they call an industry expert who, if this were ever to get beyond the pleading stage, which we would trust it would not, would never qualify as an expert. His experience was at but he himself says that he was, he was never at Wainwright, and he just talks about what, in all likelihood, in his experience at bulge bracket firms very different from Rainwight would have happened. The confidential witness, they call him an associate. In the business, they're referred to as juniors. They're young. They're subordinates. They work for research analysts, and it was a subordinate that left two months before this complaint. This confidential witness doesn't say that in his limited view, because he was a junior, again, they call him an associate. That's what a junior is. That in his limited view, there was anything wrongful. He said it was unusual. Not wrongful. Not that it violated any rule that he was aware of. Just unusual. Unusual doesn't satisfy Siento. Let's, this here seems pretty egregious here. I mean, to issue a report that sets a target price of seven dollars, then, you know, basically within a day, be involved in offering at six dollars. I mean, it's such an egregious error, and maybe just someone just dropped the ball, but can that be indication of deliberate recklessness such that it meets the Siento requirement? No, and I think the Judge Lee is this. First of all, I just want to step back and say that nobody has made the allegation, because one couldn't, that going ahead and engaging in a transaction within a 24-hour period of a research report coming out, and again, where there's no allegation at all that Liv not even knew about an impending deal, nobody's made the allegation that that's actually wrongful, but that violates any rule, whether FINRA, NASDAQ, nothing. No one has made that allegation. The allegation is simply about the, is simply saying that, well, you should have disclosed it if it existed, but even the district court at page 10 says there could be an inference that there was no deal at the time. So what I would say is that I understand certainly your comment and the comment of Judge Van Dyck that it looks bad, or as the CW said, it looks unusual, but there was nothing wrongful about it, and to the extent that the transaction happened quickly and after the report was issued, there's nothing wrong with it other than, as their confidential witness said, it appeared unusual. So even their confidential witness didn't say that it was egregious, said it appeared unusual, and I think that's the point. When you go back and you look at this pleading and you take out the woulda, coulda, shoulda, all of the guesswork, all of the conclusions, and you just look at what does it all rest on? What are the facts they've actually pled? What is the who, what, when, and where? Where is anything but innuendo? Here's their entire case. There was a research report that came out at 4am, and then there was a deal announced 17 hours later at 9pm. That's it. Those are the facts. All of the other facts they allege. Silvera was the COO. He signed the placement agreement. That doesn't mean he negotiated it. It doesn't mean he knew about it. It doesn't mean he had any role in vetting anything. There is no allegation in this entire pleading, not one, that says that who knew about both the engagement and the report approved either. There is no allegation that Livnat knew about the deal. There is no allegation that Vicklin knew about it or that Silvera, at the time the report came out, knew or had any reason to believe it. Nothing. All that's there is, oh, that looks, as their CW says, unusual. And the allegations that Kimmel puts in that says, there are all these things that would need to get done. That may be true in the kinds of deals that he worked at, at firms that are very different than H.C. Wainwright. He says nothing about overnight deals, which I think the court can take notice of, are not at all uncommon in this industry. They don't address the overnight deals at all. And according to Kimmel, there would be no overnight deals because you need three days, he says, in his experience. And that's key because his experience has nothing to do with Wainwright. He was never at Wainwright. He never spoke to anybody at Wainwright as far as we know. He doesn't say he did. And he doesn't know how those deals work. That's not what he does. And his last job was, he was writing research. He wasn't at a bank at all. So if you look at the pleading and you apply the PSLRA, you can't say that Wainwright, for example, had intent, right? I mean, it's a sort of classic PSLRA law that you have to, an entity can't have intent. It has to be traced back to an individual. So, okay, let's look at the document. Let's look at the pleading. What individual? What was alleged about anybody? Nothing. Not that any of them had any knowledge of the deal and the report. And I think that's what's critical because if this pleading, if this plea suffices under the PSLRA and 9b, based on all kinds of innuendos, what would have, could have, possibly might have happened, then I don't know what pleading wouldn't suffice. And then we've got 25 years of jurisprudence that lets this sneak in the door and it shouldn't. I think that really is the important takeaway. There is no case that they cite when you look at the facts of those cases that is even remotely like this one, because this one doesn't have any facts to back it up other than a report in the morning and a deal in the evening. That's it. That's all it's got. That's not enough. And that that's not, it's not that being at least as cogent wouldn't be enough. It isn't even there because when the district court discussed this at page 10 of its order, the first alternative inference that it led with is, well, hey, they've got all this FINRA rules in place. The first inference is that the engagement wasn't actually agreed to at the time the report came out. Another inference I believe was a possibility that Judge Van Dyck mentioned. Somebody could screw this up. The point is, those are at least as likely and in fact, according to this report, more likely than the idea that there is some unknown person who on some unknown date, having some unknown knowledge, decided for some unknown reason beyond making money to go ahead and issue a report that on its own wouldn't particularly make that much of a difference one way or the other, because, because Wainwright was getting 5% of the raise. That was the deal. And that's what it did. There is nothing else in here that can go ahead and bolster that argument. I want to make one other point. Plaintiff spends a fair amount of time discussing the holistic approach to a pleading. Look at everything, which is understandable. But I think that when you apply the holistic approach here, what you see is that other than innuendo, other than what might possibly be, there are no facts beyond the timing. And a holistic approach is an alchemy. It doesn't allow a pleader to take innuendo and try to turn those into facts. The holistic approach says, really look at it. Look at the facts together. What facts here are there beyond the timing? None. It's just the timing. Nothing is attributable to any of these actors. And Wainwright itself can't have any intent. And that's the reason that we are urging the court to affirm the dismissal by the court below. Thank you. Mr. Boyd, any questions? No. Any questions? I think there are no questions. So thank you for your argument. Thank you, Your Honor. We'll let Mr. Press have his rebuttal time. Thank you, Your Honors. First, as to this notion that it's just purely speculative, that the two-person compliance department was in a position to be looking at the report and also at the activities of investment banking, not only do we say that this was standard procedure, the defendants in their brief admit that this was standard procedure they filed. If you look at- I don't understand that to be his argument, that this compliance department didn't do this kind of stuff. I think that's precisely what a compliance argument is supposed to do. I guess what I'm struggling with with the compliance department is- I don't see how having a compliance department that was supposed to prevent something like this from happening is somehow the mere existence of that compliance department somehow is evidence. Because it would seem to me it would work the other way. Like if the fact that if they didn't have a compliance department, maybe crazy stuff is going on behind the scenes. But the fact that they have a compliance department that I think your argument is, is supposed to stop precisely this sort of thing from happening. And I don't think that your opponent is saying that the compliance department- I think they agree with you that a compliance department should have kept this kind of stuff from happening. So how does the mere fact that there's this compliance department without anything else actually support your argument? It seems to me like it actually cuts against it because if there's a mechanism that's supposed to keep something from happening, but that something still happens, most of us- I guess what you're- it would have to be the case that it's more likely that the reason it happened is because of some nefarious thing that happened as opposed to a mistake. They screwed up or something. I'm having trouble seeing how that's evidence of affirmative evidence of scienter as opposed to somebody dropped the ball here. Judge Van Dyke, it shows that there were people who ordinarily should have been looking at the activities of investment banking and contrary to what my adversary said about- Your argument has to be that not only should they have been- I don't agree. I think we all agree about that. But your argument has to be- and so the fact that they missed it or the fact that this got through means not just that they missed it or screwed up or didn't do their job right, which we're all- we all know people do that, but that these people were somehow like nefarious or something and that they actually were doing the opposite of compliance. Isn't that- has to be your argument, right? That is- that is the argument in this case, your honor, that for this one day and the factors are again the motive. Obviously, every business wants to make money and whether or not the maximum amount of the offering was $61 million or whatever, it's clearly better for subscription and just for the act. They had to go line up investors for getting investors to subscribe if you had a stock that was doing well right before rather than that was doing poorly right before. Counsel, how does your position not mean that every- so there's all kinds of compliance departments out there, right, to keep bad things from happening. And you're basically saying when the compliance department fails to do its job, there's a- the most likely reason is because they deliberately failed to do their job, that they actually were committing some sort of fraud or some sort of inappropriate- but I don't think most- that's not how most of us think about it. We must think, man, they screwed up in the compliance department. Yeah, in this case, Judge Van Dyke, I think it's still the motive and also that FinRood disclosure, which my adversary said that was written by the analyst Livnat. There's simply no facts in the record to support that, that Livnat wrote that disclosure. And he also said this is a standard FinRood disclosure that's required. And that's not true either. The FinRood section 2241c4 says that this disclosure is required if the company issuing the report expects to receive or intends to see compensation for investment banking services in the next three months from the subject company. So it's only required to be put in one of these reports, this we're going to see compensation for investment banking from this company in three months, if it's true. If you don't expect to be doing that, and here there was no other investment banking they did for more than six months for mankind, there's no requirement that you put that disclosure in. So it's not- it's not a FinRood mandated disclosure. And you have the motive. Also, the other notion that seems to be outside the record is this notion of overnight deals that mankind, that Wainwright might not have been working on the deal. Whether some deals take three to five days, and there's a possibility that they can be done overnight. There's evidence here of what happened here. If you look at pages 50 to 91 of the excerpts, there are copies of the agreements that were fully executed, negotiated, agreed upon, and signed up here. They all- we also know that there were multiple investors who signed on to this deal. So the investors had to be found, canvassed, pitched, and signed up as well. So we plead in this case, paragraphs 26 to- 23 to 26 of the complaint, based on specific documents filed with the SEC of various actions that happened here. And I think the most reasonable inference, the most plausible inference is that could not have happened in- that could not have happened in overnight or in less than 17 hours. And as far as we haven't named a single person, and it would change jurisprudence fundamentally if you allow this inference here, this court time and again allows CENTER to be pledged through evidence that certain defendants just had access to information without any evidence at the pleading stage that they actually saw the information. We plead they had access to the information. That's what Reese v. Malone, which was cited at page 28 of our brief, Quality Systems, which was cited at page 28 of our brief, and the Finisar opinion, which was discussed at pages 29 to 33, was the exact same evidence of knowledge that we have here. An industry expert and a former employee who did not have direct evidence of what happened in that particular transaction. Hey, counsel, I'm afraid you're now over your extended time. So does that conclude, or do you need another sentence? If I could have just a few more seconds, Judge Gould, it would be appreciated. And that is the Finisar opinion of this court discussed at pages 29 to 33 of our brief. Knowledge was played through evidence of what the defendant would have learned about its customers' activities from annual meetings where the customers would have discussed inventory levels. Plaintiffs had no direct evidence of what the customers actually told defendants in that case. Like I said, they had an industry expert who discussed what usually happened in the industry, and they had a former employee, but the employee couldn't speak to what actually happened with that defendant in a former employee of a customer who couldn't actually disclose what happened, discuss what happened actually with that defendant and his more than 30 customers, but just what had happened at some undetermined time, not during the class period, what that defendant discussed with his customers. It's the same type of evidence that we have knowledge here in this court, again, in that Finisar opinion in 2016 found that sufficient. Thank you, Mr. Press. I think the court understands your argument. So I think I'll thank both of our advocates for excellent arguments on both sides of the case. And unless Judge Lee or Judge Van Dyke have another question for counsel, we will submit this case now. Okay, so the front DeNova case is submitted at this time, and the advocates have our thanks for the stress of arguing during a pandemic, which we appreciate. Thank you, Your Honor. Thank you, Your Honor.
judges: Gould, Lee, Vandyke